2016 IL App (3d) 130737

Opinion filed March 29, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-13-0737 |
| v. | ) ) | Circuit No. 97-CF-89 |
| VICTOR CLINTON, | ) ) ) | Honorable F. Michael Meersman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Justice McDade specially concurred, with opinion.

**OPINION**

¶ 1     A jury found defendant, Victor Clinton, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 1996)).  After this court affirmed defendant's conviction on direct appeal (*People v. Clinton*, No. 3-97-0902 (1999) (unpublished order under Supreme Court Rule 23)), defendant filed a *pro se* postconviction petition.  The petition, which made several claims of perjury before the grand jury, was advanced to the second stage of postconviction proceedings, and counsel was appointed.  The trial court dismissed the petition at the second stage.  On appeal, defendant

argues that the dismissal was in error because his petition made a substantial showing of a constitutional violation. For the reasons set forth below, we affirm.

¶ 2                                                    FACTS

¶ 3          The State charged defendant by indictment with first degree murder (720 ILCS 5/9-1(a)(1) (West 1996)). The indictment alleged that on June 10, 1996, defendant hit and kicked Pamela Strauss, and struck her with an automobile, knowing those acts would cause her death. After an initial mistrial, the matter proceeded to a second jury trial on June 30, 1997.

¶ 4          The evidence adduced at trial indicated that Strauss was addicted to crack cocaine. On the night of June 9, 1996, Tom Groyon—Strauss's boyfriend and the father of her children—followed her to the Jolly Roger strip club. He saw Strauss leave the club with a black male, and knew she was procuring drugs from him. Groyon waited for Strauss outside the club for 45 minutes, but she never came back. At approximately 6:30 the next morning, Rock Island police discovered Strauss lying in the road near a liquor store. She was badly injured and unconscious. A subsequent autopsy would reveal that Strauss had suffered multiple blunt force traumas, including a skull fracture, hematoma, rib fractures, and a lacerated liver. The doctor who performed the autopsy testified that the injuries were consistent with being punched, kicked, and struck or run over by a car.

¶ 5          On June 11, 1996, at approximately 1:15 a.m., Davenport police officers observed a brown Pontiac Phoenix run a stop sign. When the officers pulled the vehicle over, the driver fled on foot to a nearby house. The officers approached the house and waited for backup. Defendant then came from behind the house and yelled at the officers. The officers suspected defendant was the driver of the Pontiac Phoenix; however, because they could not be sure, they impounded the vehicle. Defendant visited the Davenport police department 11 days later, admitted that he

had been driving the Pontiac Phoenix on the morning of June 11, and was issued a ticket for running the stop sign.

¶ 6     On June 26, 1996, a Rock Island crime scene investigator examined the brown Pontiac Phoenix. She collected the front driver's side floor mat from the car. An Illinois State Police (ISP) forensic biologist received the floor mat, which contained human blood stains. She cut out some blood stained carpet fibers and also prepared a sample of Strauss's blood. She sent those items to the DNA laboratory. An ISP forensic scientist in the DNA unit testified that she compared the two samples and found that the blood on the floor mat matched the DNA in Strauss's blood.

¶ 7     Among the State's witnesses was Charles Miceli, who was in the custody of the Illinois Department of Corrections (DOC)—via home monitoring and electronic detention—at the time of his testimony. Miceli testified that after being convicted of theft and deceptive practices he was incarcerated at Sheridan Correctional Center, where he was assigned the job of library legal aide. Miceli testified that defendant—who was serving time in Sheridan Correctional Center for a separate offense—approached him seeking help with a problem.

¶ 8     Miceli testified that defendant told him that he met Strauss at the Jolly Roger strip club and agreed to give her crack cocaine in exchange for sex. They drove to the area of a liquor store in order to fulfill the deal, but an argument ensued when Strauss refused to escalate beyond oral sex. A fight broke out when defendant tried to get his crack cocaine back. He kicked and punched Strauss, and ran her over with his vehicle. Defendant told Miceli that he was inquiring about DNA because he might have tracked her blood into his car.

¶ 9     Miceli had a friend contact the Rock Island police, and he contacted the internal affairs department at Sheridan Correctional Center. He gave a tape-recorded statement to Rock Island

3

detectives Dan Wood and Dave Sullivan in which he related what defendant had told him. He acknowledged that the State's Attorney had sent a letter to the DOC outlining his cooperation in the case, but knew that his testimony would not affect his discharge date.

¶ 10    Defendant testified in his own defense. He acknowledged that he met Strauss at the Jolly Roger strip club and that he agreed to give her crack cocaine in exchange for sex. He testified, however, that he left before anything happened and that he never harmed Strauss. Defendant admitted to fleeing from Davenport police and talking to Miceli about a DNA issue. He denied, however, that he told Miceli he harmed Strauss.

¶ 11    The jury found defendant guilty of first degree murder, and the court sentenced him to life imprisonment. On appeal, this court affirmed defendant's conviction. *Clinton*, No. 3-97-0902.

¶ 12    On February 11, 2004, defendant filed a *pro se* postconviction petition. The trial court subsequently appointed counsel to represent defendant. A series of delays and continuances not relevant to the issues presented on this appeal caused defendant's petition to remain unresolved for more than nine years.

¶ 13    On September 19, 2013, defendant's newly appointed attorney filed an amended postconviction petition. The amended petition contained five claims for relief: that defendant's due process rights were violated where (1) the State failed to disclose through discovery promises that it had made to Miceli in exchange for his testimony; (2) perjured testimony given by Miceli and Wood concerning those promises was used in the procurement of the grand jury's indictment; (3) perjured testimony given by Wood and assistant State's Attorney David Osborn concerning defendant's prior conviction in California was used in the procurement of the grand jury's indictment; and that defendant's right to effective assistance of counsel was violated where

4

trial counsel failed to: (4) object to Miceli's testimony; and (5) move to dismiss the indictment on the grounds that it was obtained through the use of perjured testimony.

¶ 14        In regard to the claim that Miceli and Wood committed perjury as to Miceli's benefits for testifying, the amended petition alleged that "both Miceli and Detective Woods [*sic*] testified that no promises were made to Miceli and that Miceli would have nothing to gain by testifying against [defendant] before the grand jury." The amended petition then cited to exhibit D of defendant's original postconviction petition. Exhibit D was one page of the transcript of Wood's grand jury testimony.[1] In the transcript, a juror asks Wood if Miceli had anything to gain by testifying. Wood replies: "No, he didn't and as a matter of fact we asked him what he was expecting in return and he said nothing."

¶ 15        Defendant also attached to his original postconviction petition a transcript of Miceli's interview with Wood and Sullivan. In the interview, Miceli was asked if anything was promised to him in exchange for his statement. He replied: "I've been promised nothing and I ask nothing other than my home address remains in confidence for purposes of protecting my family." Later, one of the detectives references Miceli's desire to be placed on home detention, stating: "[T]hat is evidently bogged down somewhere. I know that you had asked us to find out if there was something that could be done to speed that up?" Miceli then reiterated that he wanted to be moved from Sheridan Correctional Center for his own safety.

¶ 16        Defendant alleged in his petition that Miceli, during his interview with Wood and Sullivan, asked the detectives if they could expedite his request to be released to home

---

[1]Though that page of the grand jury transcript does not refer to the witness by name, the substance of the testimony makes it clear that the witness must be either Wood or Sullivan. The State did not contest that the witness speaking was Wood, and does not do so on appeal.

5

monitoring. Defendant further alleged that Miceli was transferred to minimum-security protective custody the day after providing his statement to detectives, and released on home monitoring the day after testifying before the grand jury. Defendant claimed in the amended petition that there was at least an implicit agreement between Miceli and the State, and it was clear that Miceli did, in fact, have something to gain by testifying. Thus, defendant concluded, "the testimony of Miceli and Woods [*sic*] that [Miceli] had nothing to gain by testimony was false and therefore amounted to perjury."

¶ 17    In regard to the claim that Wood and Osborn committed perjury by referring to a previous California conviction, the amended petition referenced two exhibits originally attached to defendant's initial petition. The first exhibit was a certificate of no record from San Bernadino County, California, in which a custodian of record averred that the county had no criminal record of defendant. The second exhibit was another excerpt from Wood's grand jury testimony. During that testimony, Osborn stated:

> "According to the computer printout I got in our '96 file he was convicted in 1994 and I think this related to a 1993 arrest for, see how they phrase it, tampering with a witness, got two years probation.
>
> * * *
>
> ***  He apparently had contact with somebody who was going to be a witness against him for a prior incident and the two of them got in an argument and [defendant] ended up following this guy around and then the police arrived and took [defendant] and a couple other people to jail."

Wood then, apparently, looked at a report, and began reading it to the grand jury: "It indicates [defendant] had been charged with assault, that he assaulted a person. Says, [defendant] saw the

6

complainant who is a person making this report at a bank and that [defendant], he was chasing him." Wood, still apparently reading from the report, then described the San Bernadino incident in more detail. In the amended petition, defendant concluded that the certificate of no record proved that he had no criminal record in San Bernadino County, thus "showing the statements to be falsely made and therefore perjured."

¶ 18    The trial court held a hearing on defendant's petition on September 27, 2013. The court announced that the petition was at the second stage of postconviction proceedings. Following arguments from the parties, the court dismissed the petition, finding that it did not make a substantial showing of a constitutional violation.

¶ 19                                    ANALYSIS

¶ 20    On appeal, defendant argues that the trial court erred in dismissing his amended postconviction petition where three of the five claims for relief set forth a substantial showing of a constitutional violation. Specifically, defendant contends that the petition made a substantial showing (1) that his due process rights were violated where his indictment was procured through the use of perjured testimony—relating both to Miceli's motivation for testifying and to defendant's criminal record in California. Relatedly, defendant also contends (2) that the petition made a substantial showing that his constitutional right to effective assistance of counsel was violated where trial counsel failed to move to dismiss the indictment based upon said perjury and appellate counsel failed to raise that issue on appeal. We find that defendant's amended postconviction petition did not make a substantial showing of any constitutional violation and that the trial court, therefore, did not err in dismissing the petition.

¶ 21    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a method by which a defendant may challenge his conviction or sentence for violations of federal

or state constitutional rights. *People v. Jones*, 211 Ill. 2d 140, 143 (2004). Adjudication of a petition under the Act follows a three-stage process. *Id*. At the second stage of postconviction proceedings, the trial court "must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If the petition does make such a showing, it is advanced to a third-stage evidentiary hearing; if it does not, the petition is dismissed. *Id*.

¶ 22        At the second stage of proceedings, all well-pleaded facts not positively rebutted by the trial record are taken as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

> "[T]he question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35 (quoting *Edwards*, 197 Ill. 2d at 246).

Because the question is one of legal sufficiency, we review a trial court's second-stage dismissal of a postconviction petition *de novo*. See *Pendleton*, 223 Ill. 2d at 473.

¶ 23                            I. Use of Perjured Testimony in Grand Jury Proceedings

¶ 24        An individual commits perjury where, under oath or affirmation, he or she makes a false statement, material to the issue in question, that he or she does not believe to be true. *People v. Pawlaczyk*, 189 Ill. 2d 177, 193-94 (2000). The act of perjury is only committed where the witness or affiant knows his or her testimony to be false. See 720 ILCS 5/32-2(a) (West 1996) ("A person commits perjury when *** he makes a false statement *** which he does not believe

8

to be true."); see also, *e.g.*, 18 U.S.C. § 1621 (1994) ("[Whomever] *** having taken an oath before a competent tribunal, *** willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true *** is guilty of perjury ***.").  A defendant's due process rights may be violated where the State presents known perjured testimony to the grand jury.  *People v. DiVincenzo*, 183 Ill. 2d 239, 257 (1998); see also *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983) ("Due process considerations prohibit the government from obtaining an indictment based on known perjured testimony.").

¶ 25    "It is well settled that a charge that the State obtained a conviction by knowing use of perjured testimony is a constitutional question within the purview of the Act." *People v. Graham*, 48 Ill. App. 3d 689, 691 (1977) (citing *People v. Gendron*, 41 Ill. 2d 518 (1969)).  Because a charge that the State obtained an *indictment* through the use of perjury at the grand jury stage also triggers due process concerns (see *DiVincenzo*, 183 Ill. 2d at 257), it follows that such a claim is also within the purview of the Act.  Our supreme court has held that absent an allegation that the State *knowingly* used perjured testimony, a mere claim that witnesses committed perjury is not sufficient to warrant relief under the Act.  *People v. Brown*, 169 Ill. 2d 94, 106-07 (1995).

> "In the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there has been no involvement by the State in the false testimony to establish a violation of due process.  [Citation.] Without such involvement, the action of a witness falsely testifying is an action of a private individual for which there is no remedy under the due process clause." *Id*. at 106.

With these principles in mind, we examine defendant's individual claims of deprivation of his due process rights.

¶ 26                    A. Perjury Regarding Miceli's Arrangement with the State

¶ 27     Defendant alleged in his petition that both Miceli and Wood testified before the grand jury that Miceli did not have anything to gain from his testimony in the case. Defendant further alleged that Miceli did, in fact, have something to gain from his testimony. Thus, defendant concludes, Miceli and Wood perjured themselves in violation of his due process rights. We disagree.

¶ 28     At the outset, we note that defendant attached an excerpt from the transcript of Wood's grand jury testimony, but not of Miceli's grand jury testimony. Thus, defendant has alleged that Miceli committed perjury, but has provided no record of what Miceli actually testified to. Though we appreciate the likely difficulties in obtaining grand jury transcripts, defendant's failure is particularly perplexing given that his other exhibits show that he *did* have access to at least some grand jury transcripts. Under the Act, a postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2012). Not only did defendant fail to attach any support for his allegation that Miceli committed perjury, but he failed to provide any explanation for that failure.

¶ 29     Defendant's petition suffers from a number of other fatal flaws as well. For example, defendant failed to allege that the State knew Miceli's and Wood's testimony to be false. Our supreme court has held that the failure to make this allegation renders a postconviction petition insufficient. *Brown*, 169 Ill. 2d at 106. Moreover, defendant failed to allege that Wood knew his testimony to be false. In other words, Wood may have been unaware of any machinations

10

between the State and the DOC, and may have believed that Miceli truly had nothing to gain. Without an allegation that Wood *knew* his testimony to be false, defendant failed to allege perjury. See *Pawlaczyk*, 189 Ill. 2d at 193-94.

¶ 30         It is possible, of course, to infer or assume a number of facts that defendant failed to allege. We could infer that Wood had found out about the State's dealings with the DOC, and thus knew his testimony to be false. We might also assume that the assistant State's Attorney who questioned Wood[2] and Miceli in the grand jury proceedings was also aware of an arrangement, and thus aware that they were committing perjury. However, were we to begin piling inference upon assumption, the second stage of postconviction proceedings would become indistinguishable from the first stage, at which a defendant must only plead the "gist" of a constitutional deprivation. (Internal quotation marks omitted.) *Edwards*, 197 Ill. 2d at 244.

¶ 31         A postconviction petition is dismissed at the first stage of proceedings "only if the allegations in the petition, taken as true and liberally construed, fail to present the 'gist of a constitutional claim.' " *Id.* (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). The "gist" standard is a low threshold, in part because the initial petition is filed without the assistance of counsel. See *id.*; see also *People v. Hodges*, 234 Ill. 2d 1, 8-11 (2009). Though the second stage must logically present a higher hurdle for a defendant to clear, the threshold remains relatively low: with the assistance of counsel, the defendant must allege facts which, if proven to be true, would substantially show that he suffered a constitutional deprivation. *Domagala*, 2013 IL

_____

[2]Though other exhibits showed that Osborn questioned Wood at some point during the grand jury proceedings regarding defendant's prior criminal record, the excerpt of Wood's testimony regarding Miceli's motivation for testifying does not indicate who was questioning him.

11

113688, ¶ 35. Especially in light of the fact that a defendant is provided with the assistance of counsel at the second stage, we find that it is not the duty of the the court—either circuit or appellate—to infer necessary facts that the defendant has failed to allege.

¶ 32   Our task at hand is not to determine whether an arrangement actually existed between Miceli and the State, or to otherwise decide if defendant's allegations have merit. Instead, our task is simply to determine whether the allegations in defendant's amended postconviction petition were legally sufficient to make a substantial showing of a constitutional violation. Even when all of the facts alleged in defendant's petition are taken as true, the petition fails to make a showing that defendant's due process rights were violated by the State's knowing use of perjured testimony.

¶ 33                    B. Perjury Regarding Defendant's Prior Criminal Record

¶ 34   Defendant alleged in his petition that Wood and Osborn "instructed the grand jury" that defendant had a prior conviction for witness tampering in San Bernadino County, California. Defendant attached to his petition a certificate of no record, which indicated that he had no prior convictions in that county. Thus, defendant contends, his indictment was obtained through the perjured testimony of Wood and Osborn[3], in violation of his due process rights. For reasons similar to those set forth above, we find that defendant failed to make a substantial showing of a constitutional violation.

---

[3]With respect to Osborn—the assistant State's Attorney questioning Wood in the portion of the grand jury proceedings excerpted by defendant—defendant did not allege that Osborn was under oath when discussing the San Bernadino conviction. See *Pawlaczyk*, 189 Ill. 2d at 193 (holding "oath or affirmation" to be an element of perjury (internal quotation marks omitted)).

12

¶ 35    It is clear from the transcript attached by defendant that Wood and Osborn were reading from and referencing a report or computer printout when discussing defendant's purported conviction for witness tampering. While the certificate of no record shows that the information contained in that report—and thus Wood's testimony—was incorrect, it does not show that Wood committed perjury. Defendant has not alleged Wood knew the report to be incorrect when he read from it and referenced it before the grand jury. Likewise, defendant has not alleged that the State knew the report to be incorrect, or knew that Wood was testifying falsely. Absent such allegations, defendant's petition is legally insufficient in making a showing that his constitutional rights were violated.

¶ 36    We would take this opportunity to note, however, that our decision here does not close all avenues of potential relief for defendant with respect to the present claims. Section 2-1401 of the Code of Civil Procedure provides a basis for obtaining relief from judgments based on false testimony. 735 ILCS 5/2-1401 (West 2012); see also *Brown*, 169 Ill. 2d at 107-08. In *Brown*, our supreme court pointed out that a remedy under section 2-1401 does not require a defendant "to establish a constitutional violation or, in the case of false testimony, that the false testimony was knowingly used by the prosecution." *Brown*, 169 Ill. 2d at 107. Defendant here has failed to allege that the testimony of Wood, Miceli, and Osborn was knowingly false and that the prosecution knowingly used that false testimony—two necessary elements for a showing of a constitutional violation. However, a defendant is *not* required to plead those elements under section 2-1401.

¶ 37                    II. Ineffective Assistance of Counsel

¶ 38    Defendant furthers contends that he was deprived of his constitutional right to effective assistance of counsel, with respect to both trial and appellate counsel. Specifically, defendant

13

argues that trial counsel was ineffective for failing to move to dismiss the indictment based upon the perjured testimony discussed earlier. Similarly, he contends that appellate counsel was ineffective for failure to raise that issue on direct appeal. Because the facts alleged in defendant's postconviction petition show that any perjury-based argument would have been fruitless, we find that the petition was legally insufficient in making a substantial showing of ineffective assistance of counsel.

¶ 39    To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was constitutionally deficient in that it fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). In so doing, a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). It is not constitutionally deficient for trial counsel to decline to bring a fruitless motion. *People v. Armstrong*, 244 Ill. App. 3d 545, 554 (1993); *People v. Bosek*, 210 Ill. App. 3d 573, 600-01 (1991). Similarly, "[a]ppellate counsel is not obligated to raise 'every conceivable issue on appeal,' but rather is expected to 'exercise professional judgment to select from the many potential claims of error that might be asserted on appeal.' " *People v. English*, 2013 IL 112890, ¶ 33 (quoting *People v. Williams*, 209 Ill. 2d 227, 243 (2004)).

¶ 40    On appeal, defendant agrees that his claim of ineffectiveness of trial and appellate counsel are necessarily tied to the merits of his substantive claims. That is, defendant insists that "if [he] were able to prove the above-outlined factual allegations at an evidentiary hearing, it would be apparent that his trial attorney was constitutionally ineffective for failing to file a motion to dismiss the indictment." However, we have already found defendant's factual allegations failed to make a showing of perjury. If each of defendant's factual allegations were

14

proven true, a motion to dismiss the indictment based on perjury would still have been denied. Likewise, such an argument on appeal would fail. Because it is not constitutionally deficient for trial or appellate counsel to put fruitless arguments before the court, defendant's postconviction petition is legally insufficient in making a showing that defendant was deprived of his constitutional right to effective assistance of counsel.

¶ 41                                                 CONCLUSION

¶ 42        The judgment of the circuit court of Rock Island County is affirmed.

¶ 43        Affirmed.

¶ 44        JUSTICE McDADE, specially concurring.

¶ 45        The majority has affirmed the second stage dismissal of defendant Victor Clinton's postconviction petition on a finding that the petition failed to make a substantial showing of a constitutional violation. Because I believe the decision to be consistent with existing case law, I concur in the judgment.

¶ 46        I write separately to express my concern that, despite the legal correctness of our decision, there appear to be omissions in the testimony that create significant doubt, at least in my mind, about the objectivity and truthfulness of a key witness for the State and about the justification for allowing him to testify.

¶ 47        At trial, the strongest evidence against the defendant was the testimony of Charles Miceli, who was a fellow inmate at Sheridan Correctional Center at the time of Clinton's alleged admissions to him. His damning testimony has been recounted in the opinion. As also recited in the majority opinion, Miceli "acknowledged that the *State's Attorney* had sent a letter to the Department of Corrections outlining his cooperation in the case, but knew that his testimony *would not affect his discharge date*." (Emphases added.) *Supra*, ¶ 10. I could find nothing in

15

the record to show that Miceli's actual testimony was affirmatively untruthful--his cooperation did not, in fact, affect his discharge date.

¶ 48　　　　But Miceli's fear, as shown by his testimony (*Supra* ¶ 15), did not require a change in his discharge date for relief. He was afraid for his safety at Sheridan. Assuaging that fear could be achieved simply by a change in placement—a change he requested and was granted incrementally in intriguing juxtaposition with the steps of his cooperation with the police and prosecution.

¶ 49　　　　In his postconviction petition, Clinton has made the following assertions pertinent to Miceli's incentive to testify, allegedly falsely, against him:

　　　　　　1. Miceli had made a written request to the DOC reporting his fear for his continued safety and seeking to be placed on home detention.

　　　　　　2. In the transcript of Miceli's interview with Detectives Wood and Sullivan, one of the detectives indicates they are aware that the request exists, is pending and is "evidently bogged down somewhere."

　　　　　　3. That same detective confirms in the transcript that Miceli has asked them "to find out if there was something that could be done to speed that up."

　　　　　　4. Miceli then confirmed, again in that same transcript, that he wanted to be moved from Sheridan for his own safety.

16

5.  In Miceli's sworn testimony at Clinton's trial he testified that the *State's Attorney* documented his cooperation in the prosecution of Clinton in a letter to the DOC.

6.  Clinton alleged that the day after the interview with Wood and Sullivan, Miceli was transferred to minimum security protective custody and the day after his grand jury testimony, Miceli was placed on home monitoring.  Because this is a second-stage proceeding, absent positive rebuttal in the record, these allegations must be taken as true.  *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

7.  In his sworn testimony at trial, Miceli confirmed that at the time he was testifying he was in the custody of the DOC by way of home monitoring and electronic detection.

8.  As shown by the transcript page submitted by the defendant, Wood testified to the  grand jury—in response to a direct question from a juror—that Miceli had nothing to gain and that Miceli had assured the detectives that he was expecting nothing in return—testimony that certainly appears to be belied by the interview transcript.

9.  As the Opinion correctly observes, Clinton did not provide any documentation from the transcript of the grand jury proceedings or elsewhere to show that Miceli made similar representations in his grand jury testimony.

17

10. Miceli did, however, testify at Clinton's trial that his testimony would have no impact on his *discharge date* despite knowing full well that he had, in fact, requested and received expedited placement to home monitoring, removing him from the DOC facility even though he was not actually discharged from DOC custody.

¶ 50       Clinton has presented enough documented and deemed facts to support a very reasonable inference that witnesses lied, actively or by omission of critical information, in securing both his indictment and his conviction. Moreover, the perjury deprived the jurors in both venues of information critical to an assessment of what weight, if any, to give Miceli's testimony. At least one grand juror indicated by a direct question that whether or not Miceli benefited from testifying was relevant. I believe there are sufficient facts for a reasonable conclusion that witnesses lied before the grand jury and at trial to lend greater credence to Miceli's testimony.

¶ 51       The supreme court has, however, held that, in a postconviction proceeding, securing a conviction, and presumably an indictment, on perjured testimony only rises to a constitutional violation if the petitioner can show that the prosecutor actually knew the testimony he was presenting was false. *People v. Brown*, 169 Ill. 2d 94, 106-07 (1995). The only fact available in the record even suggesting the requisite knowledge is Miceli's sworn acknowledgement at trial that the state's attorney sent a letter to the DOC documenting his cooperation in Clinton's prosecution.

¶ 52       This case demonstrates how easily a defendant's ability to make the requisite showing can be hindered or thwarted—by artful formulation of questions and answers, by requiring *proof* of the prosecutor's knowledge where communication between him/her and the police is unfettered

18

and frequently undocumented.  Given enough time and resources, a defendant might be able to craft an argument based on a statistical incidence of the release from a DOC facility to home detention for prisoners who only *fear* physical harm as opposed to the number who sustain actual and serious harm and are denied release.  But even that would likely be rejected as mere speculative extrapolation from general data to support a claim of wrong-doing in a specific case.

¶ 53    There is no way to know what the jurors in either venue would have done had they known Miceli's testimony had essentially been purchased.  Although the State evidently did not believe so, the jurors may have decided there was sufficient evidence of Clinton's guilt without Miceli; they may have given credence to Miceli's testimony but accorded it reduced weight; or they might have discounted it and also found the other evidence insufficient to prove guilt beyond a reasonable doubt..

¶ 54    Because it appears to me that both Wood (before the grand jury) and Miceli (at trial) were untruthful in their sworn testimony as set out above, but because Clinton has failed to prove the prosecutor had knowledge of any perjury when presenting the testimony to the grand jury and at trial, any such perjury cannot serve as the foundation for Clinton's postconviction petition.

¶ 55    I find no basis for substantive disagreement with the majority on the remaining two issues raised by Clinton in this appeal.  I, therefore, concur with the decision of the majority to affirm the second stage dismissal of Clinton's postconviction petition.