NOTICE
Decision filed 08/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 231271-U

NO. 5-23-1271

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 15-CF-1371 |
| | ) | |
| JEROMY L. RAMM, | ) | Honorable |
| | ) | Ronda D. Holliman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

## ORDER

¶ 1   *Held*:   The trial court's order denying defendant's motion for a new trial is affirmed where defendant has no standing to challenge the constitutionality of a part of the statute that does not apply to him, and the trial court did not abuse its discretion in admitting evidence of prior instances of domestic violence. The defendant did not receive ineffective assistance of counsel.

¶ 2   The defendant, Jeromy L. Ramm, appeals the trial court's denial of his motion for a new trial and/or judgment notwithstanding the verdict. Following his conviction for aggravated domestic battery in violation of section 12-3.3(a-5) of the Criminal Code of 2012 (720 ILCS 5/12-3.3(a-5) (West 2014)), the defendant was sentenced to a term of 20 years in the Illinois Department of Corrections (DOC). The defendant filed a *pro se* motion for a new trial, alleging, *inter alia*, the trial court failed to conduct a sufficient preliminary inquiry into his claims of ineffective assistance of counsel. We agreed and remanded for a preliminary hearing pursuant to *People v. Krankel*, 102

1

Ill. 2d 181 (1984), to determine whether counsel should be appointed to represent the defendant. On remand, the defendant hired new defense counsel, and the trial court concluded there was no need to conduct a *Krankel* hearing. Defense counsel filed an amended motion for a new trial and/or judgment notwithstanding the verdict. Following a hearing, the trial court denied the defendant's motion. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Pretrial

¶ 5     The defendant was charged with two counts of aggravated domestic battery (*id.*). Count I alleged the defendant had intentionally strangled Candace Brown, a household member. Count II alleged that the defendant caused great bodily harm to Brown.

¶ 6     Before trial, the State moved to admit evidence of prior instances of domestic violence involving the defendant's ex-wife, Anastasia Franzen, pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2014)), which allows the admission of other-crimes evidence in domestic-violence cases. The State made a factual proffer detailing the defendant's prior incidents of domestic violence involving Franzen in 2002, 2003, and 2004. The State's proffer provided that after the 2004 offense, the defendant spent two periods of incarceration in DOC: two years following the 2004 conviction for aggravated battery and five years following a burglary conviction in 2007.

¶ 7     At the time of the hearing, the defendant was represented by attorney Walter Ding. Ding urged the trial court to exclude the evidence of prior instances of domestic violence as substantially more prejudicial than probative given the time between the offense was "10 to 12 or even more, 14 years." The trial court granted the State's motion to admit the evidence, reasoning:

2

"The time period is several years in the past. The court received no evidence about any counseling or anything that would indicate a significant modification of the defendant's aggressive behavior. What I did hear was for some several years of that, he was in prison where he couldn't assault anyone, particularly any women.

The—it is certainly the case that evidence of this sort will be prejudicial to the defendant at trial. However, the statute makes it presumptively admissible if the requirements of the act have been met and the time period involved is less than that referred to in the *Donoho* case referred to in the motion. The court believes that the value of the evidence to the people outweighs the prejudicial value—prejudicial effect of the evidence on the defendant and that for the—and that the requirements of the statute have been met."

¶ 8    Prior to trial, attorney Alfred Ivy entered his appearance on behalf of the defendant.

¶ 9                                    B. Trial

¶ 10    Candace Brown testified on behalf of the State. In September 2015, she was living with the defendant and their daughter, Rileigh. When asked by the prosecutor, Brown affirmed that in 2005, she had been convicted of possession of a controlled substance, but subsequent to that conviction, she had not been in legal trouble.

¶ 11    Brown testified that on September 21, 2015, she was home when the defendant came in at 4 p.m. She described him as a "little agitated" and a "little snappy" in his conversation. Brown stated that the defendant was making telephone calls, trying to get some Vicodin pills although he did not have a prescription for Vicodin. Brown left to take her daughter to a friend's house. When she returned, the defendant was gone. He had told her he had to work the second shift that night. Although they normally texted each other throughout his shifts, during the time the defendant was gone, he did not respond to Brown's phone calls or texts as he normally did.

¶ 12    Brown was asleep when the defendant returned home at approximately 11:30 p.m. The defendant woke her up and asked her to come hang out with him in the living room. Brown heated up some pizza for the defendant. At around midnight, they were sitting on the couch eating pizza when the defendant suddenly called her a "lying bitch." Brown assumed the defendant said that because she had found a Facebook message to him from another girl asking him if he was done at the gym. When Brown confronted the girl via text asking why she was messaging the defendant, the girl told Brown the defendant was buying pills from her boyfriend, and Brown apologized for messaging her. Brown testified that the defendant told her she was causing problems with his job because he was friends with the girl's boyfriend at work and that Brown was too involved in his business.

¶ 13    The defendant became angry, walked around the coffee table, and backhanded Brown in the face. The next thing Brown knew, she was on the floor, and the defendant was choking her. According to Brown, the defendant choked her for 30 or 40 minutes, letting her go at times and choking her "probably" five times. She testified that each time the defendant choked her, her ability to breathe was obstructed and that during this period she may have lost consciousness. Brown's mouth was bleeding. The defendant provided her with a towel and told her to clean her face up. When she looked briefly in the mirror, she saw that her face was bruised and bloody, and her eyes were bruised and bloodshot red.

¶ 14    The defendant stood in front of the door and told Brown to call the police. Brown told the defendant she loved him and did not want to do that to him. Brown tried to calm the defendant down. She testified that she was trying to control the situation to "make it where he wasn't so, I don't know, crazy at the time." Brown testified that she believed the defendant was under the influence of a substance that night. She stated that he seemed really tired, which usually happened

4

when he drank or did pills. Brown and the defendant began to talk, and they went to the bedroom and had sex. After the defendant fell asleep, Brown took the car keys, went outside, and got in her car. She drove to the police station where she spoke to an officer who called an ambulance to take her to the hospital emergency room for treatment.

¶ 15    On cross-examination, Brown testified that she had told the police on multiple occasions that she did not want to pursue charges against the defendant. She stated the police told her that if she did not testify, her daughter Rileigh would be taken from her and she would be arrested. She stated she was also told that she could not change or correct her story.

¶ 16    Officer Matthew McKinney testified that on September 22, 2015, at 4 a.m., he received a domestic battery call. He responded to the police department where he met Candace Brown. Officer McKinney observed that Brown's eyes were swollen, her lip was bleeding, and there were scratches on her neck. The officer stated that Brown "had obviously been in some sort of physical—serious physical altercation." He testified that Brown reported that she was at her boyfriend's house when he came into the house in a "sort of rage," that he had battered her, choked her, and punched her multiple times. She reported that she had lost consciousness and regained consciousness, before sneaking out of the house after her boyfriend fell asleep. When asked whether Brown's injuries were consistent with her narrative, Officer McKinney testified, "I've seen people choked before and the consistency based on that was probably the worst I have ever seen." The officer described that Brown's eyes were bloodshot and "all of the blood vessels in her eyes were, were broken. Her eyes—almost the entire—the whites of her eyes were almost completely gone."

¶ 17    Officer Sarah Links testified that on September 22, 2015, she photographed Brown's injuries. Officer Links testified she observed facial bruising but stated that she could not see any

5

white surface in Brown's eyes and described Brown's eyes as "blood-colored" and "almost bloody to the look." Officer Links also noticed injuries and abrasions to Brown's mouth and chin as well as injuries to her neck. She described the injuries as "more substantial" than those she previously had observed in people who had been battered. The photographs were admitted into evidence and published to the jury.

¶ 18    Dr. James Park testified that on September 22, 2015, he treated Brown for her injuries. She had "contusions of her face, particularly left mouth as well as some periorbital ecchymosis as well as some subconjunctival hemorrhage as well as bruising around the chin area as well as the neck." Dr. Park testified that the redness in the conjunctiva—the whites of the eyes—would be caused by pressure applied to the neck. Brown had reported to Dr. Park that the defendant physically attacked her, choked her, lifted her up, and struck her head against the wall multiple times. The doctor testified that Brown's injuries were consistent with the injuries she had described. He also testified that the photographs of Brown's injuries were consistent with the injuries he saw.

¶ 19    Kacey Delaney was called as a witness on behalf of the State. Delaney testified that she had made plans to meet the defendant whom she had met on Facebook. The defendant picked her up at her home and drove her to a bar. On the drive to the bar, Delaney received a message from Brown asking why she was reaching out to the defendant. Delaney testified that she gave the defendant permission to respond to Brown's message, but she was not asked about the content of the response.

¶ 20    When Delaney and the defendant arrived at the bar, they had a few drinks. The defendant tried to kiss Delaney, but she refused his advances because he had a girlfriend. She asked the defendant to take her home, and the defendant drove her back to her house. On the way home, the

6

defendant seemed angry or perturbed. While they were in the car, the defendant said that "she" was "ruining this for us." The defendant dropped Delaney off at home.

¶ 21    The defendant's ex-wife, Anastasia Franzen, testified on behalf of the State. Franzen was married to the defendant between 2001 and 2007. They had a son, Jacob Ramm. Franzen testified that on July 6, 2002, she was out with the defendant at a bar while he was drinking alcohol. As the two were driving away from the bar, they got into an argument. The defendant stopped the car, pulled into an alleyway, and began hitting and choking her. After a while, the defendant drove Franzen home. When they got home, Franzen ran to a neighbor's house where the police were called. She had suffered bruises and abrasions to her neck and eyes as a result of the defendant hitting and choking her. Franzen later contacted the sheriff's department in an attempt to recant her story. She told an investigator that she had not been truthful when she reported that the defendant had abused her and that she actually had gotten into a fight with another woman. On the witness stand, she testified that she changed her story because the defendant was threatening her and she needed to get the case dismissed.

¶ 22    Franzen testified to a second incident of domestic violence which took place on June 24, 2003. Franzen had picked up the defendant from work. As they were driving home, the two began arguing because the defendant "had been on a crack binge and was also cheating with numerous women." After the two got home, the argument continued. At approximately 4 a.m., the defendant approached her and asked her if she "was over it yet." Franzen testified that when she brushed him off, the defendant "lost it." She stated, "He exploded. He started hitting me, kicking me. He had me on the floor and was kicking me. We had a bat that was by our front door. He grabbed it and started beating me with it in my neck, and I had broken ribs." Franzen testified that the defendant also choked her, obstructing her ability to breathe. She stated she was in fear for her life and safety,

7

but she was not sure if she passed out. Franzen reported the attack to the sheriff's office and went to the hospital. She obtained an order of protection against the defendant. Afterwards, however, she wrote a letter to the defendant's public defender and attempted to recant her story.

¶ 23    On October 19, 2004, Franzen and the defendant were drinking with friends. Franzen went with the defendant and his friends to a bar. When the party arrived at the bar, the defendant decided he wanted to go to another bar, which was also a strip club. Franzen told the defendant in the parking lot of the bar that she did not want to go to the strip club. Franzen went back into the bar and locked herself in a bathroom stall, hoping the defendant would leave. Instead, the defendant came into the ladies' room, kicked the stall door open, grabbed her by the hair, and dragged her from the bar. The defendant threw her into the car and demanded that she take him and his friends to the strip club. Franzen drove the car, with the defendant seated next to her in the front passenger seat. One of the defendant's friends was in the back seat. As Franzen was driving, the defendant started beating her face. She testified the defendant was "pummeling" her and "blood was going everywhere." Franzen recalled she was screaming and described what happened as a "nightmare." In attempt to attract the attention of police, Franzen was "blowing" stop signs, but there were no police around. When they arrived at the strip club, Franzen tried to run. The defendant grabbed her, threw her back into the car, and started hitting and choking her. Franzen escaped and ran into the strip club while the defendant left in Franzen's car.

¶ 24    Franzen reported the incident to police. She received emergency medical treatment for her injuries as a result of the defendant punching, dragging, and choking her. Franzen had black eyes, abrasions, scratches, and broken orbital bones. Franzen testified that as a result of these beatings, she had lasting medical injuries. She had to see a neurologist and had recent neck surgery from the baseball bat beating. After this incident, Franzen decided to file for divorce.

¶ 25     Candace Brown was called as a witness on behalf of the defendant. She testified that the effects of her injuries lasted between one and three weeks. She did not receive any follow-up treatments or medications for pain. She did not need any stitches and did not suffer any broken bones, open wounds, fractures, or memory loss. On cross-examination, she again testified that when the defendant grabbed her around the neck and applied pressure, it obstructed her ability to breathe, causing her to black out and fear for her life.

¶ 26     Jacob Ramm testified that on September 22, 2015, the defendant was home at 7 p.m. when Jacob arrived home from football practice. The defendant left at 7:30 p.m. to work the night shift, and Jacob stayed home with Brown and his two-year-old sister, Rileigh. Contrary to Brown's testimony, Jacob testified that Rileigh had not left the house earlier in the day.

¶ 27     Jacob testified he went to bed at 10 p.m. and woke up around 1:08 a.m., when he heard the door chime and the defendant returned home. Jacob left his bedroom a few minutes later to get some water from the kitchen. Jacob stated that the defendant was on the couch with his work boots off, and Brown was at the door with Rileigh. Neither Brown nor Rileigh were crying, and Brown did not seem upset. When he saw Brown, there was no bruising or blood on her face. Jacob denied seeing any blood on the floor or a bloody towel.

¶ 28     Jacob heard the door close. When he returned from the kitchen, Brown and Rileigh were gone. Jacob stated that Brown and Rileigh left in the defendant's Mustang. Although Jacob did not see Brown and Rileigh get into the car, he saw the lights of the Mustang as it pulled out of the driveway. The defendant did not say anything to him, and he went back to his room. He fell back asleep between 1:40 and 1:50 a.m. The next day the Mustang was not in the driveway.

¶ 29     Prior to coming out of his room, Jacob did not hear any noise or commotion. Jacob testified that he had lived with the defendant and Brown for two or three years. The defendant and Brown

had normal arguments, but he never saw the defendant strike Brown or Brown strike the defendant. If they argued, Brown would leave the house to stay with a friend. On cross-examination, Jacob conceded that when he was interviewed by police the next day, he told them that he did not see or hear anything. He told them he went to the kitchen, but he did not tell them that he saw Rileigh in the house.

¶ 30　The defendant testified on his own behalf. He denied causing the injuries suffered by Brown as depicted in the photographs. The defendant testified that in September 2015, he was working at Carle Clinic as a laborer. On September 21, 2015, when he arrived home from work at 4 p.m., Brown, Rileigh, and Jacob were all at home. At 5:10 or 5:15 p.m., Jacob left for football practice. The defendant told Brown he was going to work a second shift and left home again at 7:30 p.m. Instead of going to work, however, the defendant went to meet Delaney. He had contacted her on Facebook and was going to meet her in person for the first time.

¶ 31　After arriving at Delaney's home, he went inside and had a couple of drinks, before they left to go to a bar. While they were at the bar, the defendant had a couple of drinks. Delaney received a text message from Brown asking why she was contacting the defendant. The defendant explained that Brown must have gotten Delaney's phone number off of Facebook. The defendant replied to the message, pretending to be Delaney, and told Brown that he had a shoulder injury and was trying to get Vicodin for the injury. The defendant and Delaney remained at the bar, while Delaney continued to text back and forth with Brown. The defendant became uncomfortable with the situation, so he left with Delaney and dropped her off between 11:30 p.m. and 12 a.m. The defendant stated that he and Delaney did not "engage in anything romantic" that evening.

¶ 32　The defendant testified that when he arrived home between 12 and 12:30 a.m., Brown was sitting on the couch. She asked the defendant about work. When the defendant said that work was

10

fine, Brown told him that she knew he was not at work and said that she would "do him in" if she caught him cheating on her. The argument continued. The defendant stated that Brown told him that if she caught him cheating on her, he was going to "pay for it." He described Brown as "highly upset." He stated that she threatened to take Rileigh away and began packing. However, he testified, the argument never got physical. At around 1 a.m., Brown left the house with Rileigh, driving away in the Mustang. The defendant did not know where Brown was between the time she left his house at 1 a.m. and the time she went to the sheriff's department at 4 a.m. After Brown was gone, the defendant checked on Jacob and then went to sleep. He did not have sex with Brown that evening.

¶ 33    The defendant testified that when he was arrested, he had no marks, scratches or bruises on his hands, or any blood on his clothes, nor did Brown have any marks, scratches, or bruises when she left. The defendant stated that during the time he lived with Brown, he had never hit her, although Brown struck him on a few occasions. He explained that in 2011, Brown had been arrested for domestic battery against him, but he did not pursue charges. He stated that in the 2011 incident, Brown had punched him in the face, but he did not hit her. Instead, he took a step back and called the police. The defendant conceded that he had become addicted to Vicodin following shoulder surgery, but he denied that Vicodin caused him to become angry or altered his mood.

¶ 34    The defendant testified that after his divorce from Franzen, she had gotten into a relationship with another man. After the couple had been involved in a domestic dispute, the Department of Children and Family Services opened a file regarding the defendant's son, Jacob. In 2010, the defendant took a six-month anger management course in an effort to obtain custody of Jacob. He also took a parenting course and received substance abuse counseling, individual counseling, and counseling with Jacob. The defendant was required to take random drug and

11

alcohol tests for two years. At the end of this period, the defendant received full custody of Jacob. In 2007, the defendant was convicted of burglary. While serving his sentence in DOC, he successfully completed a behavioral modification program.

¶ 35    On cross-examination, the defendant conceded that he had pled guilty to two incidents of domestic violence involving Franzen. However, the defendant insisted not everything that Franzen had accused him of was true. The jury found the defendant guilty on both counts.

¶ 36                          C. Defendant's Posttrial Motions

¶ 37    In August 2016, the defendant filed a *pro se* motion for a new trial alleging, *inter alia*, that he was denied effective assistance of counsel before and during trial. Attorney Alfred Ivy, who was still representing the defendant, also filed a motion for a new trial on the defendant's behalf which was denied by the trial court. The trial court found that the second count merged with the first and sentenced the defendant to a prison term of 20 years.

¶ 38                          D. Defendant's Direct Appeal

¶ 39    On direct appeal, the defendant argued that (1) section 115-7.4, which authorizes the admission of evidence of other offenses of domestic violence of defendants accused of domestic violence, is unconstitutional; (2) the trial court erroneously allowed the State to introduce evidence of three prior domestic violence incidents; and (3) the trial court failed to conduct a meaningful inquiry into his claims of ineffective assistance of counsel and counsel should be appointed for a *Krankel* hearing. Because we agreed that the case should be remanded for a preliminary *Krankel* hearing, we did not reach the defendant's other claims.

¶ 40                          E. Proceedings on Remand

¶ 41    On March 12, 2019, attorneys Stephen L. Richards and Joshua Richards entered their appearance on behalf of the defendant, and the trial court concluded there was no longer a need to

12

conduct a *Krankel* hearing. New defense counsel filed an amended motion for a new trial and/or judgment notwithstanding the verdict.

¶ 42    At the hearing on the defendant's motion, John Charles Litchfield testified consistent with an affidavit he had signed on November 19, 2019, on request of the defendant's attorneys. Litchfield stated he knew both the defendant and Brown. On December 26, 2015, Litchfield ran into Brown at a gas station. He testified that during his conversation with Brown, she was very emotional. She told Litchfield that she had been loyal to the defendant for years and that he had cheated on her. She said that she was going to "bury his ass in the penitentiary." Litchfield testified that Brown stated that she had paid "some black girl 50 bucks to whoop her ass," but the girl took it too far. According to Litchfield, Brown stated she was going to "get [the defendant] for this," and that it was "worth it to see him go to jail and rot." Litchfield told Brown that what she did was wrong, and she agreed but said that she was mad. Litchfield called the defendant and told him about his conversation with Brown.

¶ 43    Litchfield stated that both the defendant and his father, William Ramm, told him the defendant's attorney, Alfred Ivy, would be contacting him. Litchfield testified that he left Ivy four messages, but he never heard back from him. On cross-examination, Litchfield conceded that he never contacted the police or the state's attorney about what Brown had told him.

¶ 44    Jason Parrish was called as a witness. Like Litchfield, Parrish had executed an affidavit on request of the defendant's new attorneys. The State objected to Parrish's testimony because his affidavit merely stated that he had heard rumors about Brown, which would be inadmissible hearsay. Defense counsel argued that if attorney Ivy had heard the rumors, he would have had a duty to investigate. The trial court allowed Parrish to testify over the State's objection.

13

¶ 45    Parrish testified that when he met the defendant on the day of the incident at about 9 or 9:30 p.m., the defendant appeared to be sober. Parrish had heard negative things about Brown and the defendant. Parrish stated he was never contacted by attorney Ivy, and he conceded he never gave his information to the police or the state's attorney.

¶ 46    Alfred Ivy testified he was not aware of either John Litchfield or Jason Parrish and claimed the defendant never told him about either of those witnesses. He also claimed the defendant was the only person who told him that Brown was fabricating the allegation that the defendant had attacked her. Lastly, Ivy claimed that he spoke with Brown multiple times and found her statements about the incident to be credible and consistent. Brown had not stated to Ivy that she made up the incident, and she did not tell him she had paid someone else to beat her up. Ivy claimed that he met with the defendant's father many times before his death and that the defendant's father never told him that Brown was fabricating the incident. Ivy claimed that he had discussed Franzen's testimony with the defendant and explained to him that since he had pled guilty to two incidents of domestic violence involving Franzen, it was not possible to attack her credibility.

¶ 47    When asked whether he had introduced records establishing that the defendant had completed counseling, Ivy stated he did not recall specifically, but that anything the defendant had given him in mitigation would have been presented to the court at the sentencing hearing. Ivy indicated he did not move for a change of venue because he was not aware of any pretrial publicity in the matter. He was aware that Franzen had filed for an order of protection, and he recalled that Brown also had filed for an order of protection. Ivy did not get the transcripts of the order of protection hearing related to Brown because, based upon the order of protection itself, he did not believe there would be significant variations between her testimony at the hearing and her

14

testimony at trial. On cross-examination, Ivy claimed that he did not have his notes from the case because the case file was destroyed by a flood in his basement.

¶ 48    The defendant testified that he told attorney Ding about the counseling and classes he had taken in order to get custody of his son, but Ding did not introduce it at the hearing on the State's motion to present evidence pursuant to section 115-7.4. The defendant believed the trial court would not have allowed testimony from his ex-wife regarding the prior incidents of domestic violence if this evidence had been introduced.

¶ 49    The defendant claimed that attorney Ivy visited him twice while he was in jail, once before Ivy was hired, and once after the defendant was convicted. He stated he spoke to Ivy by telephone the night before trial to discuss strategy. The defendant also claimed he had discussed the counseling and classes with Ivy regarding whether to try to re-litigate the trial court's ruling on the State's section 115-7.4 motion based on the counseling records after a new judge had been appointed to the case. When Ivy visited the defendant after he was convicted, the defendant noticed that Ivy had unopened letters from him in his briefcase. The defendant testified that both Litchfield and the defendant's father, William, told Ivy that Brown was recanting her testimony. The defendant stated that Brown's testimony as to the beating was not accurate in any respect.

¶ 50    The trial court denied the defendant's motion for a new trial, finding that while section 115-7.4 did not address rebuttal evidence, it did not violate due process because it did not prevent the defense from engaging in cross-examination, confronting the victim's bias, prejudice, or motive to testify falsely. With respect to the admission of section 115-7.4 evidence, the trial court found that the danger of undue prejudice did not substantially outweigh the probative value of Franzen's testimony and that the section 115-7.4 evidence was not presented in excessive detail. With respect to the claims of ineffective assistance of counsel, the trial court found there was no

15

credible evidence that attorney Ivy was aware of the evidence from William, Litchfield, or/and Parrish. The trial court concluded, "The defendant cannot show that counsel's performance fell below an objective standard of reasonableness where there is no credible evidence that he failed to investigate or call a witness in this case as he was unaware of the witness." With respect to the other claims in the amended motion for new trial, the trial court held the claims were waived because they had not been supported by legal authority. The defendant filed a timely appeal.

¶ 51                                II. ANALYSIS

¶ 52                                 A. Standing

¶ 53    The defendant contends that section 115-7.4, titled "Evidence in domestic violence cases," violates the due process and equal protection clauses of the United States and the Illinois Constitutions. U.S. Const., amend. IX; Ill. Const. 1970, art. I, § 2. The defendant acknowledges that section 115-7.4 has been upheld against due process challenges (*People v. Dabbs*, 239 Ill. 2d 277, 293-94 (2010)) and equal protection challenges (*People v. Jenk*, 2016 IL App (1st) 143177, ¶ 33). Nevertheless, to preserve his rights to federal review and to a fair trial, the defendant asserts that section 115-7.4 violates his right to due process and equal protection. Specifically, the defendant challenges language contained in section 115-7.3 that is not contained in section 115-7.4. We note that section 115-7.3 deals with prior incidents of sexual abuse, while section 115-7.4 covers prior incidents of domestic violence. 725 ILCS 5/115-7.3(b), 115-7.4(a) (West 2014); *People v. Dabbs*, 396 Ill. App. 3d 622, 625 (2009).

¶ 54    Section 115-7.3(b) provides that once the prosecution introduces evidence of the defendant's propensity to commit a sexual crime, the defendant may offer "evidence to rebut that proof or an inference from that proof." 725 ILCS 5/115-7.3(b) (West 2014). Whereas, section 115-7.4(a), on the other hand, merely provides that the prosecution may introduce "evidence of the

16

defendant's commission of another offense or offenses of domestic violence" with no provision for a right of rebuttal. *Id.* § 115-7.4(a). The State counters that the defendant does not have standing to raise his claim where he did not seek, nor was he denied, the right to put on evidence to rebut the State's propensity evidence or an inference from that proof. We find the State's argument persuasive.

¶ 55     "Standing is an element of justiciability, and it must be defined on a case-by-case basis." *People v. Greco*, 204 Ill. 2d 400, 409 (2003). "The purpose of the doctrine of standing is to ensure that courts are deciding actual, specific controversies, and not abstract questions or moot issues." *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989). "The general rule is that courts will not consider the validity of a statutory provision unless the person challenging the provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid." *People v. Morgan*, 203 Ill. 2d 470, 482 (2003), *overruled on other grounds by People v. Sharpe*, 216 Ill. 2d 481 (2005). "[A] party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class aggrieved by the alleged unconstitutionality." *Id.* If no constitutional defect is found in the application of the statute to the defendant, he does not have standing. *People v. Funches*, 212 Ill. 2d 334, 346 (2004). If there is no demonstration of an unconstitutional application of the statute to the defendant, the defendant "may not challenge the statute on the ground that it might conceivably be applied unconstitutionally in some hypothetical case." *People v. Wisslead*, 108 Ill. 2d 389, 397 (1985).

¶ 56     The only limited exceptions to these principles involve weighty countervailing policies, such as first amendment challenges. *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973). Thus, a defendant may challenge a statute as facially overbroad or vague only if the statute is one that may inhibit the exercise of rights of expression or association protected by the first amendment.

17

*People v. Bailey*, 167 Ill. 2d 210, 226 (1995). Here, the defendant's challenge to the statute does not involve first amendment rights nor can he demonstrate an unconstitutional application of section 115-7.3(b). The State's motion sought to present evidence pursuant to section 115-7.4 of the Code and did not implicate section 115-7.3. Accordingly, we find the defendant does not have standing to challenge any part of the statute that does not apply to him.

¶ 57                    B. Prior Incidents of Domestic Violence

¶ 58    The defendant next argues the trial court erred in allowing the State to introduce evidence of the defendant's prior incidents of domestic violence involving Franzen. Specifically, the defendant argues that the proximity in time between the incidents involving Franzen and Brown, combined with the lack of factual similarity to the charged offense, compel the conclusion that the prejudicial effect of the evidence exceeded its probative value.

¶ 59    The general rule is that proof of other crimes committed by the defendant not related to those alleged in the charging instrument cannot be introduced to show the defendant's propensity to commit crime. *People v. Hale*, 326 Ill. App. 3d 455, 462 (2001). The rationale for the rule is the danger that a jury might convict a defendant because he or she is a bad person who deserves punishment. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (other-crimes evidence is not considered irrelevant; it is objectionable because it has "too much probative value"). However, the rule has been abrogated in part by section 115-7.4 of the Code which provides that "evidence of a defendant's commission of other acts of domestic violence may be admitted in a prosecution for one of the offenses enumerated in the statute, so long as the evidence is relevant and its probative value is not substantially outweighed by the risk of undue prejudice." *Dabbs*, 239 Ill. 2d at 291.

¶ 60    Even where other-crimes evidence is admissible for a permissible purpose, the evidence should be excluded "where the probative value of that evidence is substantially outweighed by the

18

prejudicial effect on defendant's right to a fair trial." *People v. Robinson*, 167 Ill. 2d 53, 63 (1995); *People v. Chapman*, 2012 IL 111896, ¶ 19. In weighing the probative value against the undue prejudice, the trial court may consider the proximity in time to the charged offense, the degree of factual similarity to the charged offense, or other relevant facts and circumstances. 725 ILCS 5/115-7.4(b) (West 2014). "This is a balancing test with probative value on one side and prejudicial impact on the other side." *People v. Smith*, 2019 IL App (4th) 160641, ¶ 68. "Whether the probative value of other-crimes evidence is outweighed by its prejudicial impact is a determination left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion." *People v. Spyres*, 359 Ill. App. 3d 1108, 1114 (2005). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Where reasonable minds could differ about the admissibility of the evidence, no abuse of discretion is found. *Donoho*, 204 Ill. 2d at 186.

¶ 61    The defendant maintains that the prior incidents of domestic violence should have been excluded by the trial court given the length of time between the aggravated battery charge involving Brown which took place in September 2015, and the prior incidents of domestic violence involving Franzen which took place in 2002 (13 years prior), 2003 (12 years prior), and 2004 (11 years prior). The defendant argues that no published decision weighing evidence pursuant to section 115-7.4 has allowed the admission of domestic violence evidence which was this remote. The defendant, however, provides no argument and cites no legal authority as to why we should restrict our review to decisions considering evidence pursuant to section 115-7.4 when subsection 115-7.3(c) contains identical language:

"(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2014).

¶ 62    The State correctly notes the " 'admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged.' " *Donoho*, 204 Ill. 2d at 183-84 (quoting *People v. Illgen*, 145 Ill. 2d 353, 370 (1991)). Reviewing courts should consider whether to admit other-crimes evidence on a case-by-case basis. *Id.* In *Donoho*, our state supreme court declined to adopt "a bright-line rule" regarding "when prior convictions are *per se* too old to be admitted," noting it is a statutory factor to be considered when evaluating the probative value of evidence. *Id.* Thus, "while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it." *Id.* at 184.

¶ 63    In *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 33, the defendant's prior offenses occurred thirteen years prior to the charged offenses. The *Kitch* court noted that the defendant had spent 7 of the 13 years since his last offense imprisoned, making it difficult for him to commit sex crimes during this time. *Id.* Therefore, the Kitch court concluded that the defendant's prior offenses were probative of his likelihood to reoffend as he had only been released from prison for approximately six years when he committed the charged offenses. *Id.* Similarly, here, the trial court found that although a number of years had passed since the prior incidents of domestic violence involving Franzen, the defendant had been imprisoned for several of those years during which he was unable

20

to assault women. Under these facts, we cannot find that the trial court abused its discretion in admitting the prior domestic violence evidence.

¶ 64     The defendant next argues that the degree of factual similarity between the charged offense involving Brown and the prior domestic violence incidents involving Franzen was relatively small, involving different complainants, different settings, and different physical acts. The defendant maintains that in the instant case, Brown claimed that he backhanded her in the face and then started choking her for 30 to 40 minutes. Immediately after the incident, the defendant told Brown to call the police. According to Brown, the defendant and Brown then had sex. The defendant insists there was no testimony that the defendant was intoxicated, and the incident took place in their home. By contrast, the defendant argues, the incidents with Franzen involved other forms of violence, such as hitting, kicking, pulling her by the hair, beating her with a bat, and choking her. He further argues that the incidents took place in cars or in public places as well as at home and involved consumption of alcohol and crack cocaine. Following the incidents, the defendant did not tell Franzen to call the police; rather, he threatened her and persuaded her to recant.

¶ 65     There must be some threshold similarity to the crime charged before evidence of a prior offense may be admitted. *Illgen*, 145 Ill. 2d at 372. However, the prior incidents are not required to mirror the current charge; the law requires only similarity. *Id.* at 373. We note that contrary to the defendant's contention, there was testimony that he had been drinking alcohol before he arrived home from his evening with Delaney. Here, the record reveals similarity in the type of physical abuse both women suffered at the hand of the defendant even if some of the details are not identical; that is, the defendant was drinking or using drugs, became angry, struck the women in the face, and choked them. The fact that the incidents involved two different complainants and different settings is of no consequence. We find that the prior incidents of domestic violence

21

involving Franzen and the charged offenses are not so great as to eliminate the probative value of the prior incidents.

¶ 66    The defendant argues that the trial court erred in allowing the State to introduce excessive and lurid details as to the defendant's prior episodes of domestic violence. Specifically, the defendant contends that presentation of Franzen's testimony went beyond the proper scope of the admission of evidence under section 115-7.4, particularly her claims that she had tried to retract the first two allegations after the defendant had threatened her, her opinion that the third incident was a "nightmare," and her detailed description of her injuries as well as her subsequent treatments.

¶ 67    The State responds that the defendant has forfeited this argument on appeal. Although defense counsel raised the issue in his posttrial motion, he did not object to these details at trial nor did he raise defense counsel's failure to object as a claim of ineffective assistance of counsel.

¶ 68    "To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Id.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error doctrine permits a reviewing court to consider an unpreserved error if either (1) the evidence is so closely balanced that the error threatened to tip the scales of justice against the defendant (*i.e.*, the jury's guilty verdict may have resulted from the error and not the evidence), or (2) the error is so serious that it affected the defendant's substantial rights, and thus denied him a fair trial. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Jackson*, 2022 IL 127256, ¶ 19. Under either prong, the burden of persuasion remains with the defendant. *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 73. A defendant requesting plain-error review must present an argument as to how either of the two prongs of the plain-error doctrine

are satisfied. *People v. Presley*, 2023 IL App (5th) 230970, ¶ 30. Where a defendant fails to present an argument on either of the two prongs, he forfeits plain-error review. *Id.* Here, the defendant failed to request plain-error review in his opening brief and did not file a reply brief. As such, he has forfeited plain-error review on this issue.

¶ 69    We find that in admitting the three specific prior incidents of domestic violence, the trial court properly considered the statutory factors and properly undertook the weighing process, by carefully balancing the probative value against the prejudicial effect of the evidence as required by section 115-7.4 of the Code. Thus, we cannot say that the trial court abused its discretion in admitting into evidence the prior incidents involving Franzen.

¶ 70                           C. Ineffective Assistance of Counsel Claim

¶ 71    Lastly, the defendant contends he was deprived of effective assistance of counsel by trial counsel's failure to investigate or present exculpatory evidence. The defendant maintains that during the hearing on the amended motion for a new trial, he presented detailed, credible evidence that he had provided attorney Ivy with exculpatory evidence which Ivy failed to investigate or present. He insists that he and his deceased father, William, had informed attorney Ivy that Brown had admitted to Litchfield that she had lied about the defendant beating her and that she had paid someone else to beat her so she could blame the defendant. Although the defendant acknowledges that attorney Ivy testified he was unaware of the exculpatory evidence regarding Brown, he claims that Ivy's testimony was "weak and unconvincing."

¶ 72    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th)

23

150997, ¶ 61. To establish counsel's deficient performance, a defendant must show that "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Whether counsel was ineffective is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.* Trial counsel has a duty to conduct reasonable investigations into possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. The failure to interview known witnesses can indicate incompetence when their testimony could be exonerating. *People v. Steidl*, 177 Ill. 2d 239, 256 (1997).

¶ 73    A thorough review of the record reveals the defendant's argument fails because there is simply no credible evidence that attorney Ivy knew of Litchfield or Parrish or of their purported testimony prior to trial. Although Litchfield and Parrish claimed to have left messages for Ivy, attorney Ivy testified that he had not heard of either prior to trial.

¶ 74    Assuming, *arguendo*, that Ivy had known of the existence of Litchfield or Parrish prior to trial, their testimony at the hearing consisted of inadmissible hearsay which likely would not have been admitted at trial. Litchfield testified that he had a conversation at a gas station with Brown who purportedly admitted to him that she had lied about the defendant beating her. Parrish testified that he had heard rumors about Brown. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

24

matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay generally is not admissible unless it falls within a recognized exception. *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). Here, the defendant makes no argument, nor does it appear from the record, that Litchfield's or Parrish's testimony falls within a recognized exception to the hearsay rule. Thus, because their testimony at the hearing was inadmissible hearsay, attorney Ivy's failure to call them as witnesses was not deficient. See *People v. Clinton*, 2016 IL App (3d) 130737, ¶ 39 (it is not deficient in the *Strickland* sense for counsel to fail to perform a fruitless act); *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 51.

¶ 75     Although the defendant insists he discussed with attorney Ivy the possibility of presenting his counseling records to the new trial judge in an effort to reverse the trial court's ruling on the State's motion to present evidence of prior incidents of domestic violence, there is nothing in the record to support his claim. Ivy was not asked by defense counsel on cross-examination whether this conversation had occurred nor was he asked why he failed to file a motion to reconsider the trial court's ruling on the section 115-7.4 motion. Ivy's only testimony regarding the counseling records was in response to the State asking him whether he had introduced records establishing that the defendant had completed counseling, to which Ivy stated that anything the defendant had given him in mitigation would have been presented to the trial court at sentencing. Where the defendant fails to show defense counsel's performance fell below an objective standard of reasonableness, we reject his contention that he received ineffective assistance of counsel.

¶ 76                                    III. CONCLUSION

¶ 77     For the foregoing reasons, we affirm the trial court's denial of the defendant's motion for a new trial and/or judgment notwithstanding the verdict.

25

¶ 78    Affirmed.